Good morning, Your Honors. Thank you. Janet Tung from Federal Defenders of San Diego on behalf of Mr. Ibarra-Pino. I'll try to keep my eye on the clock and try to save a couple minutes for rebuttal. Mr. Ibarra proffered enough evidence to support a prima facie case for a duress defense, but the district court erroneously precluded that defense. And I think most specifically the evidence about what happened the day of the incident was the most salient towards that duress defense. And the proffer met the three elements of duress, the immediacy of the threats, that the defendant's fear be a well-grounded fear, and that there was a lack of reasonable opportunity to escape the threatened harm. And the facts that I'm talking about are that on the morning of the event that there were armed men that came to Mr. Ibarra's apartment and took him away from the apartment, and that he was brought to the car in the parking lot that morning, and that subsequently he was told that he had to drive the car across the border, and told that he was being watched, and told he was threatened, that he would be killed, and that his family was at risk of death, and his wife was at risk of death. And those facts... So the district court relied on his not turning himself in as soon as he was in a place of safety. That's correct, Your Honor. And I think the way the district court ruled on it was an error of law. I believe what the district court looked at it was... The district court looked at it after the offense was completed. After he was arrested, the drugs were discovered in the car, and he was taken to an interrogation room, the district court looked at the fact that he talked to the agents for about half an hour, 45 minutes or so, before he came out and confessed, essentially. And the district court said that was too late into the interrogation to count. But there's no requirement post-completion of the crime, there's no confession requirement in the law, and there's certainly no immediacy of confession requirement upon being apprehended. Though we do have these strange cases for Dusko and Contento Pachon that has the language that the district court relied on, whether that goes to reasonable opportunity of escape or not, I don't know, but that's our case law. Yes, Your Honor, and I think Judge Ikuda, I think that reasonable opportunity to escape a lag of harm I think really is the heart of this issue. But I think it's not where the district court was looking, it's actually the correct inquiry looks at the point in time before he's been arrested and those drugs have been found. And for Dusko, for example, in the cases where that element's been found to be missing, where Dusko comes to mind, Your Honor, I believe often the opinion of Vasquez Landauer, which is also cited below. In both those cases, the inquiry focused on the period of time before the crime was committed. In Verduzco, that was a case where the threats occurred when the defendant who lived in Los Angeles went down to Mexico, went to Tijuana, he bumped his car into a BMW, he's threatened there, he's told, come back to Mexico and cross this car for us or we're going to hurt you. He went back home for five days and he had this reasonable opportunity, five days in Los Angeles, where he could have come to the authorities and turned himself, I mean, not turned himself in, but said, look, help me. Vasquez Landauer, that was Your Honor's case, that was an illegal reentry case where the defendant there, he was threatened in his home country of El Salvador. He crossed three countries and two months elapsed between the threats and him coming to the United States. And he was trying to argue that I was under duress to come to the United States. But he had, he crossed through El Salvador, he crossed through Guatemala, he crossed through Mexico, and he made no showing that he was under any kind of threat, immediate threat, I should say. Did any of those cases, I just don't remember off the top of my head, involve threats to family? In the Contento Patron case involved threats to the family. And in that case, this court ruled that the arrest defense was incorrectly precluded, and that's what I'm asking Your Honors to abide by today. There was also threats to Mr. Ybarra's family in this case here, and the threats were the ones that the men made to him, that they would kill him. It should be different animals, right? If it's a threat to yourself, you can reach a point of safety, but threats to the family, I don't see where you can reach a point of safety. Because they've got, it's like they're holding the family hostage. It seems like a different animal. I think that's absolutely right, and I think that's what the biggest difference is really between Contento Patron and these other cases is that, and Contento Patron like this case, where there were threats to the family. And in both cases, in my case and in that case, the threats to the family were immediate, and there was evidence that the threateners knew where the family lived. Here in my case, the evidence is that the men actually physically went to my client's apartment. No, when you say evidence, you're just talking about his own testimony. Yeah, I mean the problem. No, no, that's evidence just fine. I'm not challenging you. I just wanted to make sure I understood. There's no corroboration. There's no third-party proof. There's no documentary evidence. It's just his story that that's what happened. The proffer was actually submitted in the form of the, it ultimately goes back to the statements made by the wife. And then there's his knowledge of what happened. I didn't hear what you said about the wife. The proffer was based on statements made by the wife. To the police? No, not to the police. The statements made by the wife, it was actually, it was a form of a proffer, but it was sort of statements made by the wife to the client's mother, which were then proffered in the form of a declaration by the mother. And this is all pretrial. That's what I'm trying to find out. So had he been allowed to present the defense, what is the evidence that he would have actually been able to put on in the courtroom? That's exactly, that's. No, not that. Just tell me what it is. That's the evidence that would come in. No, not that. Just tell me what it is. Okay, Your Honor. It's that his man took him from his apartment that morning. Who or what evidence consists of? Not the substance. You mean who would have presented it? Either by way of testimony or by way of documentary evidence. Is there any documentary evidence? No, there's no documentary evidence. Okay, stop. And witnesses? It would have been witnesses. And the witnesses would have been? The witnesses would have been Ms. Vasquez, the wife, or the client himself, and or the client himself. And how about the mother? The mother, there may have been hearsay issues. The mother could have, she actually did, in fact, testify. But as to what happened that morning in the apartment, there likely would have been hearsay issues from her testifying to something where. There might have been objections, but I'm trying to understand what your case would have looked like, the defense case would have looked like. So it would have been defendant testifying, his wife testifying, and you would have proffered perhaps the mother subject to a hearsay objection. Presumably so, Your Honor. I don't know what would have happened with a hearsay objection, whether it was an excited utterance or a, you know, who knows. But I just wanted to understand what that case would look like. But there was no proffer of the wife's testimony. I'm not sure I would agree with that. There was a proffer of the mother saying what the wife said. Right. There was no proffer of the wife's testimony. In the sense that there was no signed declaration submitted. Such a thing was not submitted. I'm not sure I would agree that there was no proffer of her testimony, because I think that that would count. Actually, what I wanted to get back to was the basis upon which the judge ruled, which had to do with him not, when he was in a position of safety, revealing that he was under duress. And didn't, in addition to relying upon the lateness of his statement, didn't he also rely upon the fact that he had the cell phone, that he said he tried to call his wife, that he didn't call his relatives in Mexico in law enforcement, that he had this made-up statement when he crossed the border, and that he gave another inconsistent statement before he finally suggested that this was duress. I mean, don't those weigh into it, as opposed to just looking at the lateness of when he said what he said? I believe that's correct, Judge Fulton, and I think that that is worth looking at, you know, whether or not the district judge relied on that. But I think that absolutely is worth looking at. I think the reliance on the cell phone and the availability of his family, none of that vitiates the fact that the family was under immediate threat. I completely agree with what I think Judge Kaczynski was suggesting, is that if Mr. Ibarra himself were the only one under immediate threat, then we'd be looking at a situation where he's going to be safe when he reaches, you know, he's very potentially going to be safe when he himself, you know, reaches the point of safety. But the family is out there, and he knows that these people know exactly where his family have lived, and he knows that they have threatened that they will be watching him, keeping an eye on him, and that they are going to potentially kill his wife and his family. And I think, so I think that doesn't make the cell phone's availability just simply can't be something that we can look at to say we did not show the third prong lack of reasonable opportunity to escape the harm. The statements, the lies he made to primary, I think are different. That's a different situation there, and I would like to address that separately. There's lies that he made when he first arrived at the port of entry, and there's also lies that he made after he was arrested, the drugs were discovered, and he was interrogated. Now, the lies when he made to primary, those fall into the same category as the availability of the cell phone, for the same reason, because the family in that point, when you're at primary, you're under visual, you know, scrutiny of whoever's watching you. As far as he knew in his head, I think this is fairly, I think it's fairly common that, you know, in these cases, these drug-smuggling cases, they're told somebody's going to be following you in a car, they're going to be watching you in front of their point. You can be seen, and anything you try to do is under observation. So those all, there's at least content of what Tom tells us that has to go to the jury if there is a triable issue on this lack of reasonable opportunity, and I think all those fall in the category of this should have gone to the jury. The jury should have been able to evaluate this defense. Otherwise, as... You're over your time. I did have a question of one of your other issues, and we'll give you a little time for rebuttal, since we've taken up a lot of your time for questions. You have a couple of claims of prosecutorial misconduct,  and that the defendant could have presented the video. You haven't heard a question. I just want to make sure we're on the same page. I'm on the same page as you, Justice. Good. As I understand the sequence, the... You didn't tie the case, right? That's correct. Okay, so the defense lawyer, whoever the defense lawyer was, made a statement in summation to the effect that the government could not... didn't want you to see this video. Was it an objection from the government to that statement? Well, Your Honor, I... If you don't know, that's fine. I mean, you can tell me later, but do you know whether it was an objection or not? Right now, standing here, no, but I'll take a look at it as soon as I sit down and try to see if I can find an answer to that. I know you will. So the next step, when then the government made its statement, did the defense counsel object at that time to the statement? Yes, Your Honor, that was objected to. That was objected to? Yes. I couldn't find it in the... And that's probably because I looked for it too late. Do you know where in the transcript? And what did the judge rule at that time? I was looking for the ruling, and I just... It wasn't even... I didn't find it in the brief, and I... Do you recall what the judge ruled? I believe... I could be mistaken, but I believe an objection was made and it was overruled, but I will double-check on that, and I want to find the exact... Maybe you can do that on a rebuttal, okay? Yes, Your Honor. I will give you a little time. I just wanted to know what the standard of view is for purposes of... Obviously, this is the kind of situation where there's no objection, and it makes a difference because the district judge can't fix a problem by giving a corrective instruction or whatever. But anyway, maybe you can... Unless there are questions from my colleagues right now, why don't we hear from the government?  Good morning, Your Honors. May it please the Court. Daniel Butcher on behalf of the United States. I can't answer Your Honor's question straight off with respect to the rebuttal argument issue. There was no objection made at the time to the defense counsel's argument, so the United States did not object at the time. At the time the rebuttal argument question was made... I'm not sure there would have been a basis for objecting, although... I don't think so. That type of argument is frequently... Lawyers raise objections during summation because one is often allowed to suggest inferences. But in this case, we actually had an order from the district court saying this couldn't go into... So it's a little strange for both sides to raise it, so that's why I thought there might have been an objection. I'm sorry, go ahead. I would like to speak about duress, obviously, but I do take issue with Your Honor's comment that there was an order from the district court that this could not go into evidence. There was a pretrial order in response to a motion in limine that the United States typically files in these cases where there are post-duress statements, and there's an opportunity for the defense possibly to elicit what we call self-serving hearsay through the case agent, eliciting the post-duress statement of the defendant. The district court granted that. Then we get to trial, and the United States started eliciting itself in its case in chief evidence from the defendant's post-duress statement. The district court then ruled that, well, despite the motion in limine, the United States has essentially, by doing that, opened the door for the defendant to present a continuation of that interview in cross-examination of the case agent, and indeed the defense attorney called the case agent back in the defense case in chief and elicited additional statements. So at that point, the circumstances at trial changed dramatically the landscape that led to the motion in limine. And the motion in limine wasn't specific to the video recording. The motion in limine just went to the defendant's post-duress statement. And as the district court ruled in denying the post-trial motion for a new trial, there was no preclusion or no rule that the only way that the defense attorney could have elicited the statements that he elicited at trial was through the case agent. If the defense attorney wished, he could have attempted at least, and I think he would have been successful, in playing the portions of the post-duress statement from the videotape that he wished to play. And I don't think there would have been an objection. If there would have been an objection, so long as the statement itself was within the scope of what he was allowed to do, he could have done that. That's very helpful. I had not focused on that aspect of the district court, but that's very helpful. Why don't you go ahead and answer my question on this point. Okay. Thank you. I would like to turn to duress, since that appears to be a major issue in the case. Your Honor asked a good question about do the threats to the family make this a different case. And the short answer is no. The same requirements still apply. And there are three cases, all of which were cited. The same requirements still apply, but it can still be a different case because the facts are different. The problem with, I mean, our cases seem to speak on a situation where you are under threat, you get away, and then you have a duty, first chance to turn yourself in and distance yourself from the crime. If the threat is against a loved one, and the loved one is still under threat, then you haven't really reached that point. And even though you may be in safety, you know, you and I have family, and we understand that having family under duress, we all understand that having family under duress is really no different in many ways. It's actually worse having wife and children under duress than being oneself under threat. So that's the difference. So I'm not sure the fact that he reached a point of safety matters, so long as the family is still hostage to, I mean, taking us through what his claim is, that they are hostage to the drug dealers. For that to be the case, I think we would need additional facts. And the additional facts would look something like some type of proffer or testimony from the defendant that the persons who were threatening me threatened my family as well and told me that if they did not see me on the northern side of the port of entry after I already cleared customs and inspection, then my family would be killed. And we don't have those facts here. Oh, that's awfully pedantic. Well, let's take us through what he says. I mean, again, I have no idea. I wasn't there. I know it's a dangerous place these days down there with the drug cartels in Mexico and some places across the border are quite dangerous as well because of it. And let's say, in fact, these gunslinging, bloodthirsty drug dealers hold your family hostage. Do they really have to spell out what happened to you?  And the threat is if you do something to cross us, we will do harm to your family. I mean, do you really have to say, well, they spelled out for me a seven-point plan that if I don't actually show up, that's a little much. Isn't that the kind of stuff that a jury can sort out? Isn't that the kind of stuff that you bring out in cross-examination? Well, I think in the Marino case that I cited in my brief, we had even more extreme facts where this is the case where the defendant was arrested in Honolulu Airport and he ran, attempted to evade law enforcement. And there the defendant proffered that a senior gang member, Joker, threatened to kill him and his daughters, indicated correctly where they lived and that they would be killed if he didn't transport the cocaine to Hawaii. And he was told he would be watched. And what the court held in affirming the district court's preclusion of the defense was that Marino had a reasonable opportunity to escape Joker's threat and harm at any time between his initial encounter with Joker and his encounter with the officer at the Honolulu Airport. So there was a threat to the family that I would argue is more severe. This is Marino? Correct, Your Honor. That's 102-Fed3-994. And the court there distinguished the Cotencio-Pachon case on the ground that Cotencio-Pachon, which is the case where the individual came up from Colombia carrying cocaine inside his body, that that individual, as soon as he reached the safety of the airport at the United States, cooperated at his first opportunity with law enforcement. And every case that has discussed Cotencio since then has distinguished it on that basis. The general case, J-E-N-N-E-L-L, that was a 32,000-pound marijuana conspiracy where the defendant claimed that he became involved only because of the threats made on him and his family. And, again, the court there refused to give an instruction, and this court confirmed on the ground that he had an obligation to turn himself in to authorities on reaching a point of safety. So there was no distinction of – I'm sorry, there was a few given instruction. Was there a preclusion of evidence? No, the evidence was allowed, and the instruction was not given. And I argue – Here the evidence was not allowed. I disagree with that. I absolutely disagree with that. I'm sorry. The district court initially said pre-trial that I'm – after the proffer, I'm precluding duress. The defense attorney then stood up and argued, Your Honor, you're violating my Sixth Amendment rights, my client's Sixth Amendment rights. I'm not asking for an instruction at this point. And the district court said, well, then present your evidence, and we'll take a look at the end of the case as to whether to give an instruction. And all the evidence came in. There was evidence of the threats to the defendant, evidence of the defendant's threat to the defendant's family, all put in through a defendant's post-arrest statement that was elicited both by the United States and a defense attorney. Then in the defendant's case-in-chief, the defendant's mother took the stand in order to corroborate the threats. She testified that the day after the arrest, the defendant's house was broken into, ransacked, and knives left around in order to send some type – left prominently in the residence in order to send a message. So the only evidence that was proffered that didn't come in at trial with respect to the duress defense was the hearsay statement by the mother as to what the girlfriend or common-law wife said – I believe her name was Imelda – that on the morning of the date of arrest, two individuals showed up with a gun and led the defendant away. That never came into evidence. It was never offered into evidence. The wife presumably went missing. They couldn't find her. But it's not a situation, whereas the appellant argues in her reply brief, that, well, all the other evidence that went to duress came in because it also went to some other defense and it had some other basis for relevance. Well, that evidence is no different in nature than the evidence with respect to what the defendant's wife or girlfriend would have said, that he was threatened, he was let off by gunpoint. So under the same theory under which all that other evidence came in, that certainly would have been admitted, too. So I don't think it's fair at all to say that there was any pretrial preclusion of evidence with respect to duress. I simply don't believe that the record supports that. I think, as the defense pointed out in his motion for a new trial, that the defense offered substantial evidence of duress at trial. And evidence certainly did come in with respect to threats. It was the best evidence they had, the best evidence they could muster. There was nothing that the appellant can point to that was proffered and denied other than, I'll put the footnote, the third-party culpability issue with respect to the Panado individual. That's a separate issue that we haven't really discussed, and the district court pretrial excluded that as hearsay. But I would point out, whether the court views this with respect to looking at the proffer and determining whether that was sufficient, or looking at the evidence presented at trial and determining whether an instruction should have been given, either way, the escapability prong is missing, both with respect to the period of time between when the threats were first made. It became an evidence that the threats were first made in the days leading up to the arrest. So there was a period of days between which the threats were first made and the date on which the defendant crossed that he could have but did not seek the assistance of law enforcement, and no proffer or no testimony. I'm sorry. This was from Mexican law enforcement or American law enforcement? Either or both. There was evidence. Well, he didn't testify with respect to either. And, for example, and that distinguishes the case from Contento Patron, where the defendant either testified or proffered, I'm not sure which, I believe it was testimony, that he didn't report it to law enforcement in Columbia because he believes they're corrupt. And the court said, that's a trial issue of fact that should have been submitted to the jury. No such evidence in this case was proffered. Nothing along the lines came in. To the contrary, the evidence was the defendant comes from a law enforcement family. He's got significant law enforcement contacts on both sides of the border, a stepfather who I believe is a narcotics investigator in Imperial Valley, his biological father who was a narcotics enforcement officer in Mexicali, just south of Imperial County. And that was actually proffered or postulated as the supposed motive behind threatening the defendant, some type of retaliation for his father's involvement in prosecuting their narcotics traffickers. So with that evidence, there was a period of time within which the defendant was obligated in order to get the instruction or allow the defense to either say, look, I took steps to escape by contacting law enforcement, or I had a belief that it wouldn't have been successful and it may have been backfired on me because there was some corruption or something of the like. So that's the first opportunity to escape, that period of days between which the threats were first made and the date of the arrest. Now there's a second opportunity to escape that we've discussed in some detail, once he reaches the safety of the port of entry. And even in Contento Patron, the court held that once you reach the safety of the port of entry, you have an obligation to essentially turn yourself in and explain to the officer what's going on. And he did not. And we've discussed this. He lied when he got to primary inspection about his purpose for entering the United States, claimed he was coming to study for it. I'm not sure where that comes from. Why does he have to do it either way? That goes to the, not the immediacy requirement, but it goes to the escapability requirement. Well, but he's in custody anyway, right? Well, no, not at the time he's told the first lie. He's not in custody, absolutely not. He's in primary inspection. He's attempting to have the officer simply... He could have gotten up and said, never mind, I want to go home? He had to be inspected and answer the officer's questions, absolutely. But, you know, I don't consider myself in custody when I apply, when I go on a foreign trip and I go through customs. I don't consider that a custodial situation. I just consider myself being inspected. And once I answer the questions, I provide my passport, and I get admitted into the United States. But you can't really go back either, right? It's not like you can say, well, never mind, I'm going back to Tijuana, you know, wherever he came from. There's certainly... Your car is in line. You know, you can't make a U-turn right there.  There are dogs. Absolutely, you're pretty well boxed in. People with guns. No question about it. No question about it. So I think he probably was in custody. Well, I think we could perhaps call it... So I'm not exactly sure. I mean, it's not like he walked away. You know, he meets a police officer, walks away, and then you say, you know, I should have thought of that. I mean, he's really not free to go, right? I suppose we could call it a type of a Terry stop, if Your Honor is so inclined. A very long Terry stop. Yeah, usually it's very quick. A thorough path. Usually a 5- or 10-second Terry stop, I think. They've got quite a bit of traffic that they're trying to push across. But I just want to, and I know I'm out of time, I just want to get to Your Honor's question about where the immediacy requirement comes from in the case law. And, again, I'm confusing the first problem with the third. The obligation to turn yourself in once you reach a point of safety. And it's in several cases. Well, I understand the part about, you know, you can't go meander, you can't go home, you can't go to the beach. You know, you've got to sort of go find a policeman and turn yourself in. But I'm not sure where in the, within the context of the, once you see a policeman, why you have to do it right away. Where it comes from to say you've got to sort of first thing out of your mouth, you've got to say I'm under threat. I mean, if you take seriously the question that he's under threat, you know, you might say, gee, I, you know, there's still people with guns threatening my family. And I'm not sure, you know, if I can talk my way out of this, maybe I can come out and, you know, keep my family safe. And confessing to the authorities is a good way to get them killed. I can sort of see hesitating for a little bit and thinking about it, whether you want to sort of blurt it out. And then when it becomes clear you can't, you know, you can't get away, say, okay, well, this is what happened. Right. And I understand Your Honor's point. All I can say that it's not how this Court has come down on the issue in the Marino case, in the Geno case, and in the Woofer case as well that I cited in my brief. And there have been threats to the family in all those cases, and the Court has affirmed the preclusion of the depressed defense on the precise grounds that we have here that the defendant simply didn't take an opportunity to turn himself in. Okay. I think we are out of time. Thank you. Thank you very much. We'll give a couple of minutes for rebuttal. Thank you, Your Honor. Judge Kozinski gave an answer to your question on the misconduct. The objection to the prosecutor's rebuttal closing was made on page 620 of the excerpts of record. The prosecutor says that... 620? 620. Okay. What line? It's line 18. And the statement that it's objected to is on lines 15 to 17. They say, but certainly they could have put it on the video recording if they thought it was so exculpatory. And then Mr. Hickey, the trial attorney for the defense, says, objection misstates the law, Your Honor. So is it your point that Mr. Butcher says that the defendant in fact was not precluded from putting it on the video? That's not correct, Your Honor. I think the most telling thing is that what we're really talking about is there are several requests pre-trial that were made to admit the statements by the defense. And ultimately what was keeping out the statements that he wanted to admit was the trial court's ruling that I'm precluding self-serving hearsay. And even at the time when the government says that he's changing his mind about the ruling, he's not changing his mind about the self-serving hearsay portion of it. And the most telling thing is the district court says so, finds that again post-trial in response to the post-trial motions. On excerpts of record at page 28, the district court is ruling. Page what? 28. It's volume 1. The district court is ruling on the same issue, post-trial and the post-trial motions. Okay. Hold on. Line 4 to 5. It's a skinny volume, huh? Yes, Your Honor. It's my best interpretation of the excerpts of record rule. Yeah, that's fine. I'm sorry. So it's on line 4? Actually, in lines 3 to 4, the district court recognizes that the objection was preserved and then at lines 4 to 5, the district court says again that he says, although the defendant was precluded from presenting self-serving hearsay, he was not prevented from putting on any part of the recording that was relevant and admissible. But that's the portions that he was considering to be relevant and admissible. He's saying there that setting aside those portions, he was precluding self-serving hearsay. And that's what, you know, that's what is exculpatory. That's what the prosecutor in closing is saying we could have put on. This ruling on page 28 was made at what time? It's post-trial. So this is a post-trial motion. So this is the court's ruling as to why justifying the overruled that we saw over here on page 620. Exactly. I also think it's the district court's interpretation of what his own ruling meant pre-trial and during trial. Okay. I'd be happy to answer any additional questions. Opposing counsel also argued that the defendant was not precluded from presenting any of the U.S. testimony. I think that's absolutely wrong. I think the record, it couldn't be more overwhelming that the district court's ruling was that the defense was precluded. But I think what evidence? What evidence was precluded? The evidence specifically. Actually, it's interesting the government is making this argument because the government's own brief on page 19 summarizes the evidence that was not allowed, that didn't come in as a result of the preclusion ruling. And that's the events on the day of. The government in its brief goes on to argue that the evidence that did come in didn't warrant a juror's instruction, but concedes that the evidence that didn't come in, if you added it to the pile. I think the government's made this argument for us. If you added it to the pile, it may very well have warranted a juror's instruction. I think the most important thing is that there was no instruction, and this evidence didn't come in. There was no instruction. But what evidence specifically didn't come in? It's the evidence that he was taken the day of from his apartment, the evidence that really goes to show the immediacy of the threats and the immediacy of the threats. What the government argued was that was the wife's statements or the girlfriend's statements to the mother. He said that's the only thing that didn't come in. Is that correct? Or was there other specific evidence? I believe that that's the – I don't want to say without reviewing it comprehensively, but I believe for the most part that is correct. Okay, thank you. But was she available, and did anybody try to call her? I mean, that – it's one thing to say the evidence didn't come in, but is it because she wasn't there to be called to give it or because the judge said I'm not going to let you put her on? And I think – I thought it was the former, that she wasn't there to give any testimony. Judge Bolton, the entire defense was precluded. It didn't make a difference if she was going to offer this or not. The other point that I'll make is without –  We're talking about the mother or the wife? The wife. The other point that I'll make is that everything she witnessed, Mr. Ybarra himself, and without revealing trial strategy, I'll point out that Mr. Ybarra himself also would have been a recipient witness to these facts, and he didn't testify because his defense was precluded. Well, he didn't take the stand, right? That's right. Okay, so this is not a situation where he's on the stand, you ask a question, there's an objection sustained, right? Right. Did – was he ever proffered? Did you ever proffer him as a witness and say, you know, he wishes to testify on the question of duress, and the district court said no? In that form, no. In what form, then? His specific testimony was never proffered in that way, but the substance of what could have been said either by him or by Ms. Vasquez was proffered pre-trial when the district court ruled as a matter of law in the district court's mind that this defense could not be included. But the pre-trial proffer, wasn't that just his statements that he gave in the interview, as opposed to his own proffer? The proffer – you mean, Your Honor, what was proffered as a testimony? Did he prepare a declaration? Did he testify at a pre-trial hearing? There's no declaration, Your Honor, but I would go back to – where it says that this is an issue of credibility that needs to go to the jury if there's a triable issue on it. But wasn't the only proffer his exculpatory statements to law enforcement at the secondary? I disagree with that. I think that the proffer was – I'm not aware of a rule that says the proffer has – the pre-trial proffer has to be – you have to say every single witness who could testify to that. It happens that towards trial things change. You might find additional witnesses who you think are a better witness to present the evidence to the proffer. But what I heard opposing counsel say is that the judge, in fact, did change his mind and said, okay, you put on your evidence and we'll see whether it's objectionable. Your Honor, that is absolutely incorrect. That is absolutely incorrect reading of the record. That just didn't matter. Did you hear opposing counsel say that, or did I mishear? Opposing counsel has argued that – I'm asking, maybe I didn't hear correctly. I think that is their argument, Your Honor. I think that is his argument. And I think that's an absolutely incorrect reading of the record, that consistently throughout the case it's recognized as precluded. The government's trial attorney post-trial says, judge, you properly precluded. I think in those exact words. It's either precluded or excluded, the duress defense. The district court after trial says, I properly precluded the duress defense. I just don't know how you can look at that and say that the defense was not precluded. And as far as the wife is concerned, you never proffered her as a witness? At trial, no. Or at any time? Not as a witness, no. If not as a witness, then as what? I think we proffered testimony that she could have made. We proffered it pretrial. And I think what this – I'm sorry. I'm sorry. That's what proffering as a witness means. You present the statement that they would make as a witness. I don't understand what it means, proffering her but not as a witness. We did not proffer her as a witness. Did you tell the district court, we would like to be able to have the wife testify as to X? That's how you make a proffer. Counsel stands up and, you know, you can do it by affidavit, but you can also just do it by counsel statement saying, I have a witness available who will testify X, Y, and Z. May I put on the witness to testify to that effect? We did not do that. And my understanding of what we're required to do at the pretrial stage in order to be permitted to present the defense is we need to prior the evidence. And it doesn't necessarily have to be in admissible form. We just need to proffer the evidence and not necessarily say exactly who's going to give it. Okay, where did you do that? We did it in a number of forms. There's a number of times in hearings, but the filings are in Volume 3, I think, was the under seal filing that was a pleading paper and some declarations were attached and it was filed under seal to not reveal defense strategy. And then there was a non-under seal filing that had mostly the same thing that is, I think, in Volume 2 of the excerpts of record. And then there was discussion of it at the Illuminate hearings themselves. Okay. Well, within 24 hours, I want you to send us a letter indicating where in the record those profits are. No argument. Just a letter. And from the government, I would like a letter indicating where the district court citation, where the district court changed its ruling. Thank you, Your Honor. May I ask the court to close the business on Monday, since today is Friday? Oh, yes, I can. That would be good. Thank you. Okay. Thank you, counsel. The case is argued and submitted subject to receiving additional citations. Again, this is not an argument. This is simply citations to the record. Okay? The case is argued and submitted. The next or last case on the calendar is Lucia Harre v. Holder.
judges: Bolton, Kozinski, Ikuta